In the Matter of JAH BUNNY, Also Known as CLEVELAND GUY, Appellant, v THOMAS A. COUGHLIN, III, as Commissioner of the New York State Department of Correctional Services, Respondent.

Third Department, February 4, 1993

**APPEARANCES OF COUNSEL**

*Robert Selcov,* Poughkeepsie, for appellant.

*Robert Abrams, Attorney-General,* Albany *(Leslie B. Neustadt* of counsel), for respondent.

**OPINION OF THE COURT**

Per Curiam.

Petitioner, a follower of the Rastafari religion, is presently serving a criminal sentence at Great Meadow Correctional Facility in Washington County. Rastafarian observance requires male members of the sect to leave their hair uncombed and uncut, resulting in the formation of rope-like hairstrands (dreadlocks), which must be covered in public by knit headgear (hereinafter crowns). Rastafarians also adhere to certain dietary restrictions which, in their strictest form, forbid the eating of any meat or canned foods and mandate the use of special cooking utensils.

In 1988, a class action against respondent and various correctional superintendents was commenced in the United States District Court, Southern District of New York, on

behalf of all Rastafarian inmates in the State correctional system, alleging that prison regulations requiring that their hair be cut upon entry into a correctional facility and preventing them from engaging in weekly congregate prayer, from wearing crowns in public at all times and from having a diet consistent with the tenets of their religion, violated their rights under the US Constitution. Specifically, it was claimed that these restrictions denied their 1st Amendment rights to the free exercise of religion and, citing to accommodations to Muslim and Jewish inmates regarding religious headgear and special religious diets, also denied them equal protection under the 14th Amendment. After an evidentiary hearing (at which petitioner gave testimony), the District Court granted the Rastafarian inmates relief from the haircut regulation, but denied their claims in all other respects *(see, Benjamin v Coughlin,* 708 F Supp 570, *affd* 905 F2d 571, *cert denied* 498 US 951).

Subsequently, petitioner invoked the inmate grievance procedure of the Department of Correctional Services (hereinafter DOCS) complaining of the same restrictions on his wearing of a crown in public and the rejection of his dietary requests. His grievance was denied and, after exhausting all administrative appeals, petitioner brought the instant proceeding under CPLR article 78, alleging, *inter alia,* that the denial of his requests regarding the wearing of religious headgear and diet violated his State constitutional rights to exercise his religion *(see,* NY Const, art I, § 3) and to equal protection *(see,* NY Const, art I, § 11). Supreme Court dismissed the petition and this appeal ensued.

■ We agree with Supreme Court that petitioner's claim with respect to the unrestricted wearing of a Rastafarian crown was properly rejected. It is true, as petitioner points out, that the criteria for determining the validity of prison regulations impinging on the State constitutional rights of inmates are couched in somewhat different terms than the standard of review under the parallel provisions of the Federal Constitution. The Federal standard upholds such a regulation "if it is reasonably related to legitimate penological interests" *(Turner v Safley,* 482 US 78, 89). The State standard "requires a balancing of the competing interests at stake: the importance of the right asserted and the extent of the infringement are weighed against the institutional needs and objectives being promoted" *(Matter of Lucas v Scully,* 71 NY2d 399, 406).

Thus, petitioner's claim in the instant case is not foreclosed by the judgment in the Federal class action rejecting his comparable Federal constitutional complaints. As applied by the New York courts, however, the difference between the State constitutional standard of review of inmate complaints and its Federal counterpart appears to be more verbal than substantive. Thus, the Court of Appeals has expressed its agreement with the United States Supreme Court that correctional authorities are not required to establish that the regulation complained of is the *least restrictive alternative* for achieving the relevant penological objectives in order to pass constitutional scrutiny *(see, supra,* at 405-406). Likewise, the Court pointed out that under both Federal and State approaches, "a measure of judicial deference is to be accorded the judgment of correction officials" *(supra,* at 406). In *Matter of Lucas v Scully* (71 NY2d 399, *supra),* the Court of Appeals applied the foregoing level of scrutiny in ruling that the State's penological interests outweighed what it determined was an actual impingement of the inmate's interest in free expression. There is no reason to conclude that some heightened level of scrutiny is to be applied here because petitioner's interest in the free exercise of religion is implicated, rather than that of free speech, or because of any differences between the language in the Free Exercise Clauses of the 1st Amendment of the US Constitution and NY Constitution, article I, § 3.

The penological interest claimed here with respect to the limitations on petitioner's wearing a crown is prison security. However, the factual issue as to what degree the wearing of a Rastafarian crown represents a serious threat to prison security was necessarily and actually litigated in the prior Federal class action *(see, Benjamin v Coughlin,* 708 F Supp 570, 574-575, *supra).* In that case, the District Court found that the crowns commonly worn by Rastafarians are large, loosely knit, circular wool caps and that they pose a security risk in a prison context by being readily usable for concealing weapons, drugs or other contraband. Permitting unrestricted use of the crowns would necessitate increased searches and thereby increase the potential for confrontations between guards and inmates. These findings were upheld in the rejection of the inmates' appeal on this issue *(see, Benjamin v Coughlin,* 905 F2d 571, 578-579, *cert denied* 498 US 951, *supra).* Petitioner's interests were fairly and adequately represented in the Federal class action, and the plaintiffs therein had a full and fair opportunity to litigate the security issue as

a factual matter. There is, thus, no reason not to apply issue preclusion in the instant case to the factual question of whether the unrestricted wearing of the Rastafarian crown by petitioner would constitute a security risk at his correctional facility *(see, Ryan v New York Tel. Co.,* 62 NY2d 494, 500-502).

Likewise, petitioner is bound by the District Court's finding that the wearing of yarmulkes by Jewish inmates and kufis by Muslim inmates poses less of a security risk, because these religious headgear are smaller and more closely fitted and, therefore, not as subject to use for concealing articles. Based upon the foregoing facts, we agree with Supreme Court that the valid institutional needs of prison security outweigh petitioner's religious interests in the unrestricted right to wear a crown *(see, Matter of Lucas v Scully,* 71 NY2d 399, 406, *supra).* Furthermore, the differences noted between Rastafarian crowns and headgear worn by Muslim and Jewish inmates afford a rational basis for the more permissive treatment of such inmates in this respect, and support Supreme Court's rejection of petitioner's claim of a denial of equal protection *(see, Benjamin v Coughlin,* 708 F Supp 570, 574-575, *supra).*

■ We also find no error in Supreme Court's conclusion that, due to DOCS' budgetary constraints as well as the varied nature of the Ital diet, which varies among Rastafari sects, petitioner's Free Exercise Clause right to consume the diet he requests, a kosher meal, was outweighed by DOCS' legitimate penological interests. Petitioner has failed to establish a constitutional right under the NY Constitution to his dietary request. Budgetary and administrative concerns in this case outweigh petitioner's right to be provided with the diet he requests *(see, Matter of Lucas v Scully,* 71 NY2d 399, 406, *supra; Matter of Majid v Leonardo,* 172 AD2d 914; *Matter of Malik v Coughlin,* 158 AD2d 833). Respondent relies on the averments of Earl Moore, DOCS' Assistant Commissioner for the Office of Ministerial Services, that the kosher diet program at Great Meadow is only available to those Jewish inmates who, during their incarceration at Green Haven Correctional Facility, were selected to participate in the kosher diet pilot program and that the accommodation of many different religious diets could "create substantial tension and represent [a] potential security breach" because "inmates resent special treatment being given to any one group".

The present system of providing high-protein pork substitutes, which every inmate has the option of eating, and an

inmate's right to refuse to eat certain foods is a more practical and cost efficient substitute for the diet offered to petitioner rather than ordering respondent to supply the more expensive kosher diet which no more adequately satisfies petitioner's religious beliefs than what is now offered. As the competing interests weigh in favor of the diet plan presented by the correction officials, Supreme Court properly denied petitioner's dietary requests *(see, Matter of Lucas v Scully, supra,* at 406).

LEVINE, J. (concurring in part and dissenting in part). We respectfully disagree with so much of the majority's decision as upholds respondent's denial of petitioner's religiously based dietary request. First, contrary to what the majority's decision suggests, petitioner is only seeking an accommodation to his religious beliefs equivalent in dietary content to accommodations already made for the religious dietary practices of Muslim and Jewish inmates. Petitioner, in his administrative grievances and his petition and sworn reply affidavit herein, clearly and unmistakably states that he would be satisfied if correctional authorities provided him *"with the exact same dietary accommodations that respondents already make for Jewish and Muslim prisoners.* I ask that respondents provide a protein substitute when red meat or poultry is served, in the same manner as they do when pork is on the menu. I also ask, in the alternative, that I be permitted to eat the same alternative kosher meal that is now being served to Jewish inmates" (emphasis supplied).

With the foregoing in mind, we turn to the penological interests identified by respondent as militating against petitioner's request, which the majority finds are sufficient to outweigh petitioner's rights under NY Constitution, article I, § 3. Those penological interests are outlined in the affidavit of Earl Moore, the Department of Correctional Services (hereinafter DOCS) official referred to in the majority's decision. Moore states that the refusal to accede to petitioner's dietary request is based on budgetary, administrative and security concerns. As to the specific budgetary and administrative concerns involved in granting petitioner's request, Moore avers that there is no well-defined Rastafarian diet and, therefore, it would be unfeasible for DOCS to meet the varying individual dietary demands of the approximately 300 Rastafarian inmates in the State correctional system. He further states that DOCS lacks the resources and space to provide the additional equipment for the preparation of spe-

cialized diets, and lacks the funds to contract outside the facilities for meals accommodating the religious beliefs of Muslim or Rastafarian inmates.

As demonstrated above, however, petitioner is not seeking institutional compliance with a strict Rastafarian diet, but merely the elimination of the most religiously objectional elements of the regular prison fare, which would be satisfied by providing him with meatless meals or the kosher diet provided for Jewish inmates. It is noteworthy that the Rastafarian plaintiffs in the previous Federal class action *(see, Benjamin v Coughlin,* 708 F Supp 570, *affd* 905 F2d 571, *cert denied* 498 US 951) never clearly limited their requests for relief to that sought by petitioner here, and it was because of the lack of clarity of their dietary request that the Federal appeals court rejected their claim for relief *(see, Benjamin v Coughlin,* 905 F2d 571, 580, *cert denied* 498 US 951, *supra).*

Although respondent points out that petitioner's request represents a compromise of customary Rastafarian dietary tenets, respondent has not raised any issue regarding the sincerity of petitioner's request or alleged that it is not actually based upon his religious convictions. That petitioner's conscience would be satisfied by something less than full compliance with the Rastafarian dietary mandates he would follow outside of prison is not a valid reason to reject his request; to do so on this ground would, in effect, put DOCS in the untenable position of promoting religious orthodoxy *(see, Reed v Faulkner,* 842 F2d 960, 963; *Teterud v Burns,* 522 F2d 357, 360). The majority commits the same error in asserting that petitioner's diet request "no more adequately satisfies petitioner's religious beliefs than what is now offered". It would follow, therefore, that respondent's institutional concerns based upon the wide dietary variations in Rastafarian religious observance should not be entitled to any significant weight in the balancing process required under the State constitutional challenge of prison regulations here.

Further, once the concern regarding varied Rastafarian dietary demands is removed from the equation, respondent's budgetary and administrative objections appear to be vague and unsubstantiated. The record here establishes that (1) DOCS already has devoted the budgetary and administrative resources necessary to furnish Muslim inmates with a protein-rich, meatless diet as often as twice a week when pork is included in the regular menu at correctional facilities

throughout the system, (2) correctional facility administrative burdens have been assumed in order to permit Muslim inmates to prepare and eat their meals in their cells during the month-long Muslim holiday of Ramadan, and (3) in one major correctional facility, Jewish inmates may elect to be provided a strictly kosher diet in content and preparation, and in at least five other facilities Jewish inmates may receive a kosher-acceptable diet consisting of fruits and vegetables, uncooked rice or potatoes and cheese, canned tunafish and peanut butter.

These established facts strongly suggest that the additional budgetary and administrative burdens involved in granting petitioner's request to furnish him with the simple, basic, meatless diet presently provided daily to Jewish inmates and up to twice a week to Muslim inmates would be inconsequential. This is sufficient to distinguish this case from *Matter of Malik v Coughlin* (158 AD2d 833, 834), principally relied upon by respondent, where the inmate's request included "ritually mandated preparation of food", as well as a special diet.*

Thus, on this record, and unless we uncritically accept respondent's conclusory assertions whole cloth, the budgetary and administrative burdens identified by respondent to justify the denial of petitioner's dietary request, if they are not illusory, certainly do not outweigh petitioner's legitimate rights to exercise the precepts of his religion *(see, People v Lewis,* 68 NY2d 923, 925).

Alternatively, Moore suggests a penological security interest in denying petitioner's dietary request, which the majority also relies upon in upholding respondent's determination. The averment describing respondent's security concern is, in its entirety, as follows: "In addition, inmates resent special treatment being given to any one group. The large number of inmates together at mealtime could create substantial tension and represent potential security breach." We do not believe that petitioner's concededly valid right to practice, at least in some minimal way, the dietary precepts of his religion while in prison should be so lightly overcome on the basis of this kind of conjectural, unsubstantiated assertion. Moreover, fears of inmate resentment apparently did not prevent respondent

---

* The case of *Matter of Majid v Leonardo* (172 AD2d 914) is also distinguishable, because in that case the inmate sought a diet including ritually slaughtered meat or an unspecified alternative diet consistent with his beliefs.

from giving Muslim and Jewish inmates special dietary treatment. It was incumbent upon respondent to submit evidence establishing a reason in fact for this otherwise arbitrary and discriminatory response to petitioner's religiously based request *(see, Reed v Faulkner,* 842 F2d 960, 964 [Posner, J.], *supra).* In the absence of some nonspeculative explanation for accommodating Muslim and Jewish inmates' but not petitioner's religious dietary precepts, petitioner's religious needs are deliberately being treated differently from those of Muslim and Jewish inmates for no reason at all; "this is a denial of equal protection of the laws in an elementary sense" *(supra,* at 964).

For all the foregoing reasons, we would modify the judgment by reversing so much thereof as dismissed petitioner's claim for relief regarding the provision of a diet not violative of his religious beliefs during his incarceration, and granting his petition to the extent of enjoining respondent to provide either a meatless diet for petitioner or the same kosher diet presently provided Jewish inmates at the correctional facility where petitioner is incarcerated.

MIKOLL, J. P., CASEY and HARVEY, JJ., concur; LEVINE and MAHONEY, JJ., concur in part and dissent in part in a separate opinion by LEVINE, J.

Ordered that the judgment is affirmed, without costs.